# HUDSON RIVER TELEPHONE COMPANY, RESPONDENT, *v.* THE WATERVLIET TURNPIKE AND RAILROAD COMPANY, APPELLANT.

*Electrical interference with the working of telephones by the use of electric railway motors — rights of the respective companies in the streets — remedy for such interference.*

In an action brought by a telephone company, incorporated under the general act providing for the incorporation of telegraph companies, to restrain a street railroad company from operating in the city of Albany, by means of single-trolley electric motors, cars which had previously been drawn by horses, it appeared that the railroad company was in 1862, by its charter, authorized to use "the power of horses, animals, or any mechanical or other power, or the combination of them, which the said company may choose to employ, except the force of steam."

*Held*, that, under the terms of its charter, the railroad company was entitled to use electricity as a motive power.

That, as the telephone company was also lawfully using electricity for telephonic purposes, each company was vested by public grant with franchises and privileges for unlike occupations of the street, the grant of which to one was not necessarily repugnant to the grant to the other, nor in derogation thereof, unless it was impossible for the one to co-exist upon the same street with the other.

That the claim of exclusive privilege would not be allowed when not expressly conferred by the terms of the grant.

The business of the telephone company was seriously prejudiced by reason of the disturbances created in the electric current, passing through its wires to its subscribers and returning through the earth, by the much stronger electrical current used by the railroad company for its electric motors, for the return of which the earth was also used.

It was found by the court that of the two methods suggested to prevent the interference of the respective electric currents used by the plaintiff and defendant, namely, a metallic circuit by the telephone company and a double trolley-system by the defendant, that the former would be the less expensive and would obviate the difficulty.

*Held*, that as the intention of the legislature in making the grants to the respective corporations was to promote the public welfare, and as these grants should be so construed, if practicable, as to permit both companies to occupy the same street, beneficially to themselves and to the public, each company was bound to adopt, upon equitable terms, such reasonable methods and safeguards as would most effectually prevent interference with the other or injury to itself.

That as the plaintiff could by the use of a metallic circuit, which would dispense with the use of the earth for the purpose of the return current, protect itself against the injurious effects of the greater volume of electricity employed by the defendant, no necessity existed for denying the use of electricity to the defendant.

*Quære,* whether the railroad company should contribute in whole or in part to the expense to which the telephone company would be put in the construction of this metallic circuit.

A preliminary injunction was granted, which was continued *pendente lite* at Special Term, preventing the use of the electric motors by the railroad company.

*Held,* that such injunction should be continued until the railroad company should stipulate that the trial court might consider the necessary expense to the telephone company of preventing by metallic circuit, or otherwise, the interference with the operation of its telephones; what damages, if any, the telephone company had sustained, and would sustain, until such interference could be prevented, and that the trial court might adjudge to the telephone company against the railroad company such recovery for said expense and damages as might be just and equitable, and that the railroad company should give a bond, by way of assurance of its payment of any amount that might so be adjudged against it, upon compliance with which conditions the injunction should be vacated.

APPEAL from an order of this court, made at a Special Term held at the city of Albany on the 26th day of November, 1889, and filed in the Albany county clerk's office, January 3, 1890, restraining and enjoining the defendant from operating its road or running its cars between the south bounds of the power-house of the said defendant in North Albany, so-called, and South Ferry street, in the city of Albany, by what is known as the single-trolley or single-wire system of electricity, until the final determination of the above-entitled action, and from the whole of said order, and also from certain other orders, respectively, dated November 12, 1889, November 16, 1889, and November 18, 1889, and entered in the office of the clerk of the county of Albany, the order of November, 16, 1889, on January 3, 1890, and the order of November 18, 1889, on January 4, 1890, and from each of said orders.

This action was brought by the plaintiff upon the ground that the operation of the defendant's cars by the single-trolley system would irreparably injure and damage the plaintiff, and that the amount of such injury and damage could not be computed in money; and that if the defendant were allowed to operate its cars, in order to conduct a telephone business at all, the plaintiff would have to entirely change its plant, system and mode of doing business from that which is the accepted and almost universal method of conducting and furnishing the telephone service; and a judgment was demanded restraining the defendant from operating its railroad through the city of Albany by the electric single-trolley system.

The plaintiff was incorporated in 1883 under chapter 265 of the Laws of 1848, as amended by chapter 471 of the Laws of 1853, relating to the incorporation of telegraph companies, and was engaged, before the introduction of electric motors upon the defendant's road, in furnishing telephonic service to the citizens of Albany.

The defendant was a domestic corporation duly incorporated and chartered as a turnpike company under and by virtue of chapter 141 of the Laws of 1828, entitled "An act to incorporate the Watervliet Turnpike Company," and of other acts amending the same; and by virtue of chapter 233 of the Laws of 1862, entitled "An act to authorize the Watervliet Turnpike Company to construct and maintain a railroad on their present road, and to extend the same into and through the villages of West Troy and Cohoes and the town of Watervliet, and the city of Albany; to increase the capital stock and to alter their corporate name," the defendant's name was changed to the Watervliet Turnpike and Railroad Company; and it was by the said last-mentioned act authorized to construct and maintain one or more railroad tracks and ways through the streets of the village of West Troy, upon obtaining the consent of the board of trustees of said village, and upon and along the turnpike road between said village of West Troy and the city of Albany, and in and through Broadway, in the city of Albany, to the South Ferry, with the consent and with such restrictions as might be deemed proper by the common council of the city of Albany.

After the passage of chapter 233 of the Laws of 1862, the common council granted a franchise and consent permitting the defendant to lay a track or tracks for a horse railroad through Broadway to South Ferry street, in said city, under certain restrictions.

By section 4 of the said chapter 233 of the Laws of 1862, the defendant was "authorized to take, transport and carry property and persons upon the said railroad track or tracks for a compensation, by the power of horses, animals or any mechanical or other power, or the combination of them which the said company may choose to employ, except the force of steam." By section 11 of the act the defendant, in addition to certain other powers, authority and privileges granted and conferred by it, was granted the power and authority mentioned and defined in and by the first ten subdivisions of section 28, except the fourth and seventh, and in the thirty-

fifth, forty-second and forty-fifth sections of chapter 140 of 1850, providing for the incorporation of railroad companies, excepting the right to use steam as a propelling power on said road.

*Matthew Hale, John S. Wise* and *L. G. Hun*, for the appellant.

*D. C. Herrick,* for the respondent.

LANDON, J. :

It appears that the plaintiff is lawfully incorporated as a telephone company, and is lawfully in possession of its lines, poles, stations and apparatus and that it lawfully operates the same.

The defendant was incorporated in 1828 as a turnpike company, and by chapter 233, Laws of 1862, it was authorized to operate a street railroad. The plaintiff challenges the right of the defendant to use electricity as its motive power. The act in question authorized the defendant to use " the power of horses, animals or any mechanical or other power, or the combination of them, which such company may choose to employ, except the force of steam." The plaintiff bases its challenge upon the fact that, in 1862, electricity, as a propeller of railway cars, was unknown, and hence not within the intention of the legislature. But the legislators of that day were not ignorant of the inventive and experimental activity of the age ;. and had they intended to grant to the defendant the right to use any power except steam, which subsequent invention or experiment might demonstrate to be most beneficial to the company and to the public, the language employed would have been apt for the purpose. We, therefore, think the terms and intent of the act embrace electricity as a motive power. By the grant of the State the plaintiff lawfully uses electricity for telephonic purposes, and the defendant lawfully uses it for railway propulsion, and each company has its respective rights and privileges along the same streets and highways. As the public grant vests in each company franchises and privileges. for unlike occupations, the grant to one is not necessarily repugnant to the grant to the other, nor in derogation of it unless it is impossible for the one to co-exist upon the same streets and highways with the other. The grant of public franchises and privileges by the State is strictly construed, and hence, as between claimants under

different grants, unless more is expressly granted, no more passes than is reasonably necessary for the beneficial enjoyment of the grant. (*People ex rel. Third Ave. R. R. Co.* v. *Newton*, 112 N. Y., 396.) The claim of exclusive privileges will not be allowed when not expressly conferred. (*Syracuse Water Co.* v. *City of Syracuse*, 26 N. Y. St. Rep., 364.) The grant of franchises and privileges is unlike a grant of land. The grantee of land is vested with exclusive dominion, and whoever, without permission, injuriously invades it, whether by personal entry, by polluted waters or noxious vapors, infringes upon the owner's rights. To the extent that there is here a grant of the use of land as space on the surface, or above or beneath it, having measurable dimensions, the grant to the telephone company may be likened to a grant of land, and the defendant may not exclude it from that space, though it might be competent for the court to readjust the occupancy so as to afford mutual accommodation. Thus one may, by municipal permission, lay his gas, water or sewer pipes beneath the surface of the street. A railway company may subsequently be granted the privilege to lay its tracks upon the same street, subject to the proper readjustment of the gas, water and sewer pipes, and the owner of the latter has no vested right to prevent such readjustment. No complaint is here made as to any visible invasion of the plaintiff's defined or enclosed field of space. The plaintiff alleges an invasion of its electrical field, or rather that the defendant extends its electrical field so as to include or co-occupy that of the plaintiff. Unlike fields of land, these electrical fields are not definitely measurable. They extend into the regions above and below the surface of the earth, but to what extent, or how constant or variable, the president of the plaintiff, in his affidavit, declares that he " is entirely unable to state."

It is obvious that rules applicable to a definite acreage of land may not be applicable here. The grant to each company is to employ upon the same street the invisible energies of nature; and, since it is in vain to define the fields that confine them, we are per force constrained to seek for methods which will neutralize or reduce to a minimum the injurious effects of their contact or interference with each other. That method, it seems to be conceded, exists in the device for a metallic circuit for the return current of the electricity. The earth completes with the outgoing wires a natural

return circuit for the electricity sent forth upon the wires from the generating stations ; but, since the earth is common to both companies, and both cannot use it, but one company may safely use it.   If the one company must use an aerial metallic circuit, the problem seems to be which company, under the circumstances, ought to use the metallic circuit ; and if the plaintiff ought to use it, ought the defendant to pay the expense thereof wholly or in part.

The method which either party should employ for the return circuit for its current of electricity is not defined in the grant of its franchises, and, therefore, is not expressly, much less exclusively, bestowed.   Neither company, therefore, has any exclusive privilege to use what is called the grounded or earth circuit.   Both companies are granted privileges upon certain streets.   The public motive inducing the respective grants was to promote the public welfare, and to enlarge the public benefits to be derived from the streets. It is plain that if these grants can be so construed as to permit both companies to occupy the same streets beneficially to themselves and to the public, such construction should be adopted.   To accomplish this each company should adopt, upon equitable terms, such reasonable methods and safeguards as shall most prevent interference with the other or injury to itself.   Each grant, therefore, as against the necessary requirements of the other, has no greater extent than is reasonably necessary for its beneficial enjoyment.   What is reasonably necessary must depend in some degree upon what is known to be the most approved available appliances both to avoid inflicting injury or receiving it between each other.   The same rule which binds them to care to avoid injury to third persons binds them as to each other.   Both companies can maintain and operate their respective plants upon the same streets, and each should do what is reasonably necessary to avoid interference with the other and to protect itself. The railroad company does not threaten to come into contact with the poles of the telephone company nor with its wires, except as the greater volume of electricity employed by defendant may, by induction above ground and conduction under ground, disturb the proper and more delicate operation of the smaller volume of electricity employed by the plaintiff.   If there were no reasonable and practicable method to obviate this interference, the defendant must needs desist from the use of electricity as a railway motive power upon

the streets preoccupied by the plaintiff. This, for the reason that the privilege to operate the telephone beneficially gives the real value to the established lines and is valuable property. It cannot be presumed that the State intended to destroy or diminish this property in the absence of an express revocation of chartered privileges. But, as the plaintiff can be protected or can protect itself against the injurious effects of the electricity employed by the defendant, no necessity exists for denying the use of electricity to the defendant. Clearly, if there are two methods open to the plaintiff, one exclusive of the defendant and the other not, and both equally serviceable and practicable, the latter should be adopted. It remains to consider whether the railway company ought to do more or otherwise than it has done to prevent electrical interference with the telephone company, and whether the telephone company can reasonably be required to adopt other and approved methods to protect itself from such electrical interference. Upon the evidence before us it seems to be true that the single-trolley system adopted by the railway company is the best now known, regard being had to mechanical, electrical and financial considerations, but without regard to electrical interference with the telephone, which uses the grounded or earth circuit instead of a metallic circuit. The plaintiff does not use the metallic circuit. It is much cheaper to construct the metallic circuit for the telephone than for the railway. It appears to be shown by the evidence that the metallic circuit, if employed by the telephone company, would obviate the electrical interference of which plaintiff complains. We should certainly, in the interest of the public, as well as that of the railway company, permit the latter to construct its road upon the most approved system. Other methods for the protection of the telephone are suggested. But it does not appear that any other is equally effective to prevent disturbances. To construct the metallic circuit for the telephone would be expensive, but how expensive does not appear. Assuming, then, that the adoption of a metallic circuit for the telephone is the most reasonable method of obviating the injury from electrical interference, the question will arise whether the telephone or railway company ought to bear the expense. This is an equity action in which, upon the trial, the court will have juris-

diction to administer all the relief which the nature of the case and the facts demand, and to frame its judgment in such terms as shall compel obedience by both parties. Whoever seeks equity must do it, and hence the court, in its equitable mandate against the defendant, can impose equitable conditions upon the plaintiff. In one sense the injury complained of is neither irreparable nor necessarily continuous, since it can be removed by incurring the necessary expense. But if the plaintiff shall incur all the expense without compulsion or legal duress, it might be regarded as voluntarily incurring it, and hence could not recover it from defendant, and would suffer to that extent irreparable loss. The present methods of the plaintiff are all it requires if the defendant should not interpose its destructive agency. It may be that the defendant ought to bear the expense of a change of plan. That expense would be less and the advantages to the defendant greater than if it were compelled to adopt the double-trolley system. It may be that plaintiff's obligation to maintain a metallic circuit after it shall have been established will be the proper measure of its share of the burden. It may also be that priority in time gives the better equity. The defendant may lawfully enter upon the street, but the condition may be implied that it shall also indemnify others already rightfully there against the additional expense which its entry subjects them to, as in the case of the gas, water and sewer pipes already referred to. But we cannot now well decide who will ultimately be liable for this expense, or whether, equity requires its apportionment. This matter was less fully considered upon the argument than the electrical and other important features of this somewhat novel case.

We cannot place the burden of this expense in the first instance upon the defendant, since the plaintiff ought not to yield control of its lines to the defendant. The necessities of the case compel us to require the plaintiff to assume it in order to protect itself against the defendant.

Ordered, that the injunction be continued as follows for thirty days and until the defendant shall stipulate :

1. That the court may determine on the trial what has been or what will be the necessary expense to the plaintiff of preventing, by metallic circuit or otherwise, the injury to and interference with the operation of their telephone, complained of in the complaint.

2. And that the court may further determine on the trial what damage, if any, plaintiff has sustained to its business or will sustain by reason of the matter set forth in the complaint before the same can be, with reasonable care, prevented as aforesaid.

3. And that in this action the court may adjudge to the plaintiff, against the defendant, such recovery for said expense and for said damages as may be just and equitable on the proof established at the trial.

And further, until the defendant shall have given to the plaintiff a bond in the penal sum of ———— dollars, with two sufficient sureties, duly acknowledged, said sureties to justify in the usual manner; conditioned that the defendant will pay to the plaintiff any sum or sums which may be adjudged against defendant in this action.

Upon the giving of said stipulation and bond the defendant may apply, on two days' notice to any judge of the General Term, for a certificate that said bond and stipulation have been duly given. On filing said certificate the injunction shall be raised.

Should the injunction be vacated as above provided, the plaintiff may within twenty days thereafter (or such further time as may be granted by any justice) serve a supplementary complaint so as to seek the recovery of such expense and damage, or other or further relief as it may be advised. No costs of this appeal; order to be settled.

LEARNED, P. J., concurred.

Injunction continued for thirty days, and until stipulation and bond as provided for in opinion; no costs; order to be settled by LEARNED, P. J., and LANDON, J., on two days' notice.